Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, DANIEL VESELY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL VESELY, on behalf of himself and all similarly situated persons,<br><br>    Plaintiff,<br>v.<br><br>STATIC MEDIA INC., a Delaware corporation; YAHOO INC., a Delaware corporation,<br><br>    Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

1

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff DANIEL VESELY ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendants STATIC MEDIA INC., a Delaware corporation and YAHOO INC., a Delaware corporation (collectively "Defendants" or "Engadget"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.   NATURE OF THE ACTION

1.     This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.engadget.com (the "Website"), a website that Defendants provide for public access and use.

2.     During his use of the Website, Plaintiff navigated to the following pages, unaware that Defendants were causing and permitting Third Parties to intercept the content of his communications:

- https://www.engadget.com/glaad-says-games-are-failing-lgbtq-players--this-weeks-gaming-news-173003080.html
- https://www.engadget.com/apps/apple-told-to-remove-lgbtq-dating-apps-by-china-130022336.html
- https://search.engadget.com/search?p=lgbtq

3.     Defendants caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing and/or the referrer URLs reflecting prior navigation, which were transmitted to the Third Parties during the page-load process itself.

4.     As set forth in the Specific Allegations section of this Complaint below, Defendants surreptitiously embed and operate third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendants intentionally deploy these technologies to accomplish their

commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

5. Defendants deploy these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendants have done so from prior to the beginning of the class period in this case and continuously through to today and ongoingly.

## II.    GENERAL ALLEGATIONS

6. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, session-level identifiers, and browser and device characteristics.

8. When users visit the Website, Defendants cause tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following: Google Analytics 4 and the Google DoubleClick advertising stack, the Comscore ScorecardResearch measurement tag, the Rubicon Project programmatic advertising integration, and the Yieldmo programmatic advertising integration. The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendants' direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties." The third parties who operate the Trackers use the intercepted contents of users' communications collected via the Website for their own

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendants' direct needs, for their own financial gain.

9. The Trackers are operated by distinct third parties, including Google LLC (as to Google Analytics 4 and the DoubleClick advertising stack), Comscore, Inc. (as to the ScorecardResearch measurement tag), Magnite, Inc. (as to the Rubicon Project programmatic advertising integration), and Yieldmo, Inc. (as to the Yieldmo programmatic advertising integration) (collectively, the "Third Parties"). Defendants knowingly embed and deploy the Trackers on the Website and configures them to execute automatically within users' browsers upon page load and navigation. As a result, Defendants cause the interception and transmission of the contents of users' electronic communications with the Website to servers controlled by the Third Parties.

10. Defendants' conduct is intentional and coordinated, as the Trackers operate pursuant to Defendants' deliberate configuration and are not necessary to render the Website's core content or functionality. The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization.

11. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendants did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising,

4

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

analytics, or monetization purposes.

12. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

### III. PARTIES

13. Plaintiff DANIEL VESELY is a California citizen residing in Los Angeles County, California and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred during the class period including but not limited to on January 29, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

14. Defendant STATIC MEDIA INC. is a Delaware corporation with its headquarters in Indiana that owns, operates, and controls the Website, an online platform through which Engadget provides technology news, reviews, and related editorial content to consumers nationwide.

15. Defendant YAHOO INC. is a Delaware corporation with its headquarters in New York that owns, operates, and controls the Website, an online platform through which Engadget provides technology news, reviews, and related editorial content to consumers nationwide.

16. Static Media Inc. is a digital media company that operates a portfolio of online publications in the United States. Engadget, a flagship technology publication within Static Media's portfolio, provides journalism, product reviews, cultural and industry commentary, and technology news content to readers through the Website and related digital platforms. Static Media maintains its principal executive offices in Indiana and serves readers nationwide, including millions of users in California.

17. Static Media Inc. conducts media and publishing operations nationwide and engages in content development, advertising, and commercial operations centered on its digital publications and platforms. Static Media's business activities include operating the Website, through which consumers browse technology news, reviews, and opinion content, and monetizing that audience through digital advertising, including through the

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

use of third-party tracking technologies deployed on the Website.

18.    The Website, including the mobile site, serves as a core component of Engadget's digital presence. The Website provides users with access to technology news, reviews, cultural commentary, and other digital content, and functions as the primary consumer-facing platform through which California users access Engadget's content. The Website is integrated into Static Media's broader digital infrastructure and employs web-based technologies that operate in connection with page loads, navigation, and user interaction.

## IV.    JURISDICTION AND VENUE

19.    Defendants are subject to personal jurisdiction in this District. Defendants operate the Website, which is accessible to and actively used by California residents, and derives substantial advertising and data-monetization revenue from California-based audiences. Defendants have purposefully availed themselves of California markets and California consumers by designing, maintaining, and optimizing the Website and its associated tracking and advertising stack to capture, segment, and monetize the browsing activity of users located in California.

20.    Defendants have cultivated California as a significant advertising and readership market. The Website serves as a primary digital channel through which Defendants reach California consumers, delivers editorial and advertising content to users located in California, and sells advertising impressions and audience segments tied to California traffic and California-based advertisers. In furtherance of those commercial operations, Defendants have entered into ongoing agreements with California-based third-party tracking and advertising-technology operators, including Google LLC (Google Analytics 4 and DoubleClick) and Magnite, Inc. (Rubicon Project), and has integrated those companies' JavaScript tags, pixels, and SDKs into the Website for the purpose of audience measurement, behavioral profiling, and targeted advertising directed at California users.

21.    Through these partnerships, Defendants have embedded third-party

6

tracking technologies into the Website that, when a California resident visits or navigates the Website, cause the resident's web-browsing communications, including page requests, URLs, referrer information, device and browser identifiers, cookie values, and interaction data, to be transmitted from California to infrastructure operated by these California-based advertising and analytics companies. Plaintiff, a California resident, accessed the Website from within California, where each page load and interaction triggered the deployment of these tracking technologies and the transmission of Plaintiff's browsing communications to the California-based third-party tracking companies with whom Defendants have contracted. Defendants' collection and transmission of California residents' browsing communications to California-headquartered tracking and advertising companies through the Website constitutes conduct expressly aimed at California and intentionally directed at exploiting the California market, and it foreseeably causes injury to the privacy rights of California users within this State.

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy.

24. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and the parties are minimally diverse.

25. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendants regularly transact business in this District, operate the Website that serves millions of California residents, and is subject to personal

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, as Plaintiff and other Class Members browsed the Website from within this District; (3) Plaintiff resides in this District; and (4) Defendants derive substantial revenue from California customers in this District.

## V.    FEDERAL AND STATE PRIVACY LAWS

**1.    *The California Invasion of Privacy Act (CIPA)***

26.    The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

27.    Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

28.    CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein constitute concrete injuries sufficient to establish Article III standing.

29.    Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**2.**    *The Federal Wiretap Act*

30.    The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

31.    The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

32.    In *In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589 (9th Cir. 2020), the Ninth Circuit held that plaintiffs plausibly alleged Facebook was not a "party" to the relevant communications for purposes of the Wiretap Act and Cal. Penal Code § 631(a) party exemption, where Facebook's plug-in code allegedly caused users' browsers, without their knowledge, to duplicate referer-header information from GET requests sent to third-party websites and transmit that information to Facebook through a separate, simultaneous channel. The court concluded that this type of simultaneous, unknown duplication did not entitle Facebook to the party exemption as a matter of law at the pleading stage. In distinguishing cases involving IP addresses and basic site-level URLs, the court further recognized that the alleged full-string URLs and referer headers there could reveal the particular documents viewed, search terms, and other information about users' interests and browsing activity, and therefore were materially different from bare routing information. The court expressly limited its holding to the sufficiency of the

9

allegations and declined to decide the other statutory elements.

33. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI.   SPECIFIC ALLEGATIONS

### 1.   The Google Analytics 4 / DoubleClick Tracker

34. Defendants embedded and deployed Google Analytics 4 (GA4) and the Google advertising stack on the Website, analytics and advertising platforms operated by Google LLC. The GA4 tracking code, once loaded in a visitor's browser, intercepts the URL of each page visited and transmits it, together with a persistent client identifier, to Google's collection endpoints in real time and without user interaction, from which the data is further routed to Google's advertising infrastructure.

35. Figure 1 shows a GET request to Google Analytics' endpoint at analytics.google.com/g/collect, displayed in Fiddler's Raw view. The capture is of the GA4 g/collect request fired when the user submitted the "lgbtq" search query on search.engadget.com. The Raw view shows the full request line and HTTP headers as transmitted, confirming the presence in a single outbound request to Google's collection endpoint of: (a) the full URL of the user's LGBTQ search page in the dl (document location) parameter (dl=https://search.engadget.com/search?...lgbtq...), explicitly identifying the protected-category search the user performed; and (b) a persistent cid (client ID), an identifier assigned by Google to the individual browser and used to track that visitor across sessions and Google properties. The request is keyed to the Measurement ID tid=G-H2EP6H9Y3S, which is the Google Analytics property identifier assigned to the Website. The Referer header identifies the Engadget search page as the page from which the transmission was initiated.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 1:**



36.     Figure 2 shows a second Google Analytics transmission from the same browsing session, this one captured in the Chrome DevTools Network panel with the request URL displayed in the Headers view. The capture is of the GA4 g/collect request fired when the user submitted the "lgbtq" search query on search.engadget.com. The request URL confirms the transmission, in a single outbound request to Google's collection endpoint, of: (a) the full URL of plaintiff's LGBTQ search page in the dl= parameter (dl=https://search.engadget.com/search?...lgbtq...), explicitly identifying the protected-category search that the user performed; (b) the document-referrer parameter dr=https://search.engadget.com/; and (c) a persistent cid value identifying the individual browser. The same request also transmits the privacy-signaling parameters npa=0 and dma=0, indicating that personalized advertising was enabled notwithstanding those

11

signals' presence in the payload.

**Figure 2:**



37.    Figure 3 shows the cookies stored in the browser during a browsing session on the Website. Google's persistent identifiers are stored on the .engadget.com domain, each configured to persist for multiple years. These identifiers tie each subsequent HTTP request from the browser back to the same visitor record within Google's tracking infrastructure, confirming that Google's interception of the page URL is linked to a persistent, cross-session profile.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 3**:

38.    Google LLC and its operators used the intercepted browsing data, including the full URLs reflecting the specific content navigated by visitors to the Website, together with persistent client identifiers, to build and maintain individual user profiles, serve targeted advertising through Google's advertising network, and conduct behavioral analytics, including as to Plaintiff and the Proposed Class.

39.    Google LLC is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and diverted the contents of those communications to its own servers and advertising infrastructure for its own commercial purposes.

40.    By causing Google LLC to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631(a).

**2.    The Comscore Tracker**

41.    Defendants embedded and deployed the Comscore digital measurement tag on the Website, an audience measurement and analytics platform operated by Comscore, Inc. and its ScorecardResearch division. The Comscore tag, once loaded in a visitor's browser, intercepts the URL of each page visited and transmits it, together with cross-

13

domain persistent identifiers stored under Comscore's own domain, to Comscore's servers at sb.scorecardresearch.com in real time and without user interaction.

42.    Figure 4 shows a GET request to Comscore's tracking endpoint at sb.scorecardresearch.com/p, displayed in Fiddler's Raw view. The capture is of the Comscore beacon fired when the user loaded the LGBTQ-topic article on the Website. The request carries, in a single outbound HTTP request: (a) the full URL of the LGBTQ-topic article in the c7 content-URL parameter, https://www.engadget.com/apps/apple-told-to-remove-lgbtq-dating-apps-by-china-130022336.html; (b) the page title in the c8 parameter; (c) Comscore's measurement type and publisher identifiers (c1=2, c2=7241469); and (d) cross-domain persistent identifiers UID and XID, transmitted in the request's cookie header within the same request. The HTTP Referer header on the same request identifies the Engadget article page as the page from which the Comscore transmission was initiated.

**Figure 4:**

43.    Figure 5 shows the same Comscore transmission captured in the Chrome DevTools Network panel, Headers view. The capture confirms that the single GET request to sb.scorecardresearch.com/p carries the full URL of the LGBTQ-topic article in the c7 parameter, along with the page title in c8 and the referrer URL in c9.

14

Comscore's server response re-sets the UID and XID cookies on the .scorecardresearch.com domain, each with value ending …600447, SameSite=None; Secure (XID also Partitioned), and max-age=33696000 (expiring on or about February 23, 2027), refreshing Comscore's ability to recognize the visitor on future visits to any website where the Comscore tag is deployed.

**Figure 5**:



44.    Figure 6 shows the cookies stored in the browser during a browsing session on the Website's LGBTQ dating apps article page. Comscore's persistent identifiers UID and XID are stored on the .scorecardresearch.com domain, configured to persist into 2027. The storage of these identifiers on Comscore's own domain, rather than on engadget.com, confirms that they are Comscore's identifiers, not publisher-assigned, and that they persist across every website on which the Comscore tag is deployed.

/ / /

/ / /

15

**Figure 6**:



45.     Comscore, Inc. and its operators used the intercepted browsing data, including the URLs reflecting the specific content navigated by visitors to the Website, together with cross-domain persistent identifiers, to measure audience behavior, generate readership analytics, and maintain individual visitor records across the web, including as to Plaintiff and the Proposed Class.

46.     Comscore, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and diverted the contents of those communications to its own servers for its own commercial purposes.

47.     By causing Comscore, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631(a).

### 3.     The Rubicon Tracker

48.     Defendants embedded and deployed the Rubicon Project programmatic advertising integration on the Website, a real-time bidding platform operated by Rubicon Project, Inc. (now operating as Magnite). The Rubicon integration, once loaded in a visitor's browser, intercepts the URL of each page visited and transmits it, together with pre-classified topical keyword labels describing the page's subject matter and persistent

16

cross-partner identifiers, to Rubicon's servers at fastlane.rubiconproject.com in real time and without user interaction.

49. Figure 7 shows a GET request to Rubicon Project's tracking endpoint at fastlane.rubiconproject.com/a/api/fastlane.json, captured in Fiddler Classic in the Inspectors Raw view. The capture is of the fastlane.json request fired when the user navigated to the LGBTQ dating-apps article at https://www.engadget.com/apps/apple-told-to-remove-lgbtq-dating-apps-by-china-130022336.html. The request transmits, in a single outbound call to Rubicon's endpoint: (a) the full URL of the article page, appearing in both the referer= and tg_i.page= parameters, explicitly identifying the protected-category content the user was viewing; (b) Rubicon's Engadget-specific integration identifiers account_id=17250, site_id=524370, and zone_id=3157046, confirming that the Rubicon integration is provisioned specifically for the Website under Rubicon's own account system; and (c) persistent cross-partner identifier values transmitted in the same request, including eid_pubcid=d18b690e-aa67-4ebb-9a02-2b2b820db112 and eid_liveintent, establishing that Rubicon links the intercepted page URL to persistent user identifiers shared across unrelated publishers and advertising partners.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 7:**



50.    Figure 8 shows the same Rubicon transmission in the Chrome DevTools Payload panel. The capture confirms that the single request to Rubicon's endpoint carries, in addition to the full article URL (transmitted in both the rf and tg_i.page parameters), the keyword parameter kw=Apple,China,iOSAppStore,datingapps,LGBTQ,Blued, a pre-classified topical label set describing the sensitive subject matter of the article, together with Rubicon's cross-partner eid_pubcid.org and eid_liveintent.com OpenRTB EID identifiers. The co-transmission of the full URL, the topical keyword set, and the persistent cross-partner identifiers within a single request establishes that Rubicon received not only the fact of the visit but a structured description of the content consumed, linked to a persistent visitor identifier.

/ / /

/ / /

18

**Figure 8**



51.    Figure 9 shows the same Rubicon request reviewed for privacy-signaling and anonymization mechanisms. The request carries gdpr=0, us_privacy=1YNN, gpp (Global Privacy Platform), and gpp_sid parameters, which communicate privacy-framework signaling values to Rubicon. These parameters are signaling values only; no masking, hashing, truncation, or anonymization is applied to the page URL, the topical keyword set, or the persistent identifiers in the request, and no DNT header, GPC signal, or opt-out mechanism is honored. The full content URL and the visitor identifiers remain transmitted to Rubicon in unaltered, fully readable form.

/ / /

/ / /

/ / /

19

**Figure 9:**



52.     Rubicon Project, Inc. and its operators used the intercepted browsing data, including the URLs reflecting the specific content navigated by visitors to the Website and the pre-classified topical keyword labels describing that content, together with persistent cross-partner identifiers, to conduct programmatic bidding, build and maintain individual visitor profiles, and serve targeted advertising through Rubicon's real-time bidding network, including as to Plaintiff and the Proposed Class.

53.     Rubicon Project, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and diverted the contents of those communications to its own servers for its own commercial purposes.

54.     By causing Rubicon Project, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631(a)

**4.      *The Yieldmo Tracker***

55.     Defendants embedded and deployed the Yieldmo programmatic advertising

20

integration on the Website, a real-time bidding and ad-exchange platform operated by Yieldmo, Inc. The Yieldmo integration, once loaded in a visitor's browser, intercepts the URL of each page visited and transmits it, together with a description of the page's content and persistent cross-partner identifiers, to Yieldmo's servers at ads.yieldmo.com in real time and without user interaction.

56.    Figure 10 shows a GET request to Yieldmo's prebid endpoint at ads.yieldmo.com/exchange/prebid, captured in Fiddler Classic in the Inspectors Raw view. The capture is of the prebid request fired when the user navigated to the LGBTQ gaming article at https://www.engadget.com/glaad-says-games-are-failing-lgbtq-players--this-weeks-gaming-news-173003080.html. The request transmits, in a single outbound call to Yieldmo's endpoint: (a) the full URL of the article page, transmitted in the page_url parameter, explicitly identifying the protected-category content the user was viewing; (b) a textual description of the article content, transmitted in the description parameter; and (c) persistent cross-partner identifier values and an eids array referencing liveintent.com and pubcid.org source domains, establishing that Yieldmo links the intercepted page URL to a persistent user identifier shared across unrelated publishers and advertising partners. The same pubcid value transmitted to Yieldmo in this request is also transmitted to Rubicon in the same session, confirming that a single identifier links the visitor's browsing across both ad-tech platforms simultaneously.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 10:**



57.    Figure 11 shows the same Yieldmo transmission in the Chrome DevTools Network Payload panel. The Payload panel displays the prebid request's query-string parameters as discrete rows, confirming that a single outbound request to Yieldmo's endpoint carries: (a) the full article URL in page_url=https://www.engadget.com/glaad-says-games-are-failing-lgbtq-players--this-weeks-gaming-news-173003080.html;    (b) the article headline in title=GLAAD says games are failing LGBTQ players | This week's gaming news; (c) a textual summary of the article in description=The week's headlines, now in video form!; (d) Yieldmo's Engadget-specific placement identifiers nested in the p parameter and identifying the ad unit within Yieldmo's account system; and (e) persistent cross-partner identifier values and an eids array with pubcid.org and

22

liveintent.com source entries. The co-transmission of the full URL, the readable article title and description, Yieldmo's Engadget-specific placement identifiers, and persistent cross-partner identifiers within a single request establishes that Yieldmo received not only the fact of the visit but a structured, human-readable description of the content consumed, linked to a persistent visitor identifier that Yieldmo shares with other ad-tech platforms.

**Figure 11:**



58.     Figure 12 shows the cookies transmitted and set in a Yieldmo prebid request during the user's browsing session on the Website's LGBTQ gaming article page, captured in the Chrome DevTools Network panel's Cookies sub-tab. The Response Cookies table displays Yieldmo's persistent identifier yieldmo_id, set on the .yieldmo.com domain with an expiration of January 29, 2027. The storage of this identifier on Yieldmo's own domain, rather than on engadget.com, confirms that it is Yieldmo's identifier, not publisher-assigned, and that it persists across every website on which the Yieldmo integration is deployed, enabling cross-site correlation of the user's browsing activity for as long as the cookie remains valid.

/ / /

23

**Figure 12**:



59.    Yieldmo, Inc. and its operators used the intercepted browsing data, including the URLs reflecting the specific content navigated by visitors to the Website and the descriptive content labels accompanying those URLs, together with persistent cross-partner identifiers, to conduct programmatic bidding, build and maintain individual visitor profiles, and serve targeted advertising through Yieldmo's real-time bidding and ad-exchange network, including as to Plaintiff and the Proposed Class. The same cross-partner pubcid identifier transmitted to Yieldmo in the capture described above is also transmitted to Rubicon in the same browsing session, establishing that Rubicon and Yieldmo receive and share a common cross-partner identifier linking the visitor's browsing activity across both platforms.

60.    Yieldmo, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and diverted the contents of those communications to its own servers for its own commercial purposes.

61.    By causing Yieldmo, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendants violated Cal. Penal Code § 631(a).

/ / /

24

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

### 5.    *The Trackers Read Content In Transit*

62.    Figure 13 shows the Firefox DevTools Network waterfall captured during a browser load of the gaming article at https://www.engadget.com/glaad-says-games-are-failing-lgbtq-players--this-weeks-gaming-news-173003080.html. The waterfall displays the first-party request for the article at www.engadget.com alongside concurrent outbound requests to multiple third-party tracker domains, including ads.yieldmo.com (Yieldmo), sb.scorecardresearch.com (Comscore), fastlane.rubiconproject.com (Rubicon Project), and additional Rubicon infrastructure endpoints at pixel.rubiconproject.com, eus.rubiconproject.com, and token.rubiconproject.com, each initiated in parallel with the delivery of the article's content to the user's browser.

**Figure 13:**



63.    Figure 14 shows a continuation of the same page-load waterfall from Figure 13. Additional requests to fastlane.rubiconproject.com, ads.yieldmo.com, and related Rubicon infrastructure endpoints at pixel.rubiconproject.com fire in parallel during the same browsing session, including two additional Rubicon fastlane.json prebid auctions and two additional Yieldmo prebid requests, documenting that third-party tracker activity continues throughout the user's interaction with the Website rather than terminating when the initial page request is answered.

25

**Figure 14:**



64.    The network requests from Google, Comscore, Rubicon, and Yieldmo are initiated automatically at page load, without any user interaction, contemporaneously with the delivery of the Website's content to the visitor's browser. The Firefox DevTools Network waterfall captures (Figures 13 and 14) further confirm that the interception of the page URL and persistent visitor identifiers occurs in real time, while the communication between the user and the Website is in progress, not after that communication is complete.

## VII.    CLASS ALLEGATIONS

65.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website were intercepted by one or more Trackers between January 29, 2025 and the present.

66.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendants.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

67.     COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendants configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendants' conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendants' conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendants' conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Defendants' conduct violates the California Constitution;
- Whether the Defendants' conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

68.     TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

69.     ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in

27

conflict with the Class or whose inclusion would otherwise be improper are excluded.

70.   SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII.   FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### *By Plaintiff and the Class Members Against All Defendants*

71.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

72.   Plaintiff brings this cause of action on behalf of himself and the Class.

73.   California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained.

74.   The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers received human readable copies of URL strings in the same HTTP request or response in which the Website servers received it, while that communication was in transit between Plaintiff's browser and the Website.

75.   Defendants intentionally configured their website to transmit Plaintiff's and Class members' URL contents to the Trackers and itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

to the communications between Plaintiff and the Website.  Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

76.     Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX.     SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### *By Plaintiff and the Class Members Against All Defendants*

77.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

78.     Plaintiff brings this cause of action on behalf of himself and the Class.

79.     18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

80.     The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' event browsing. As described in the preceding tracker-specific allegations, the Trackers intercepted URL contents in real time, in the same HTTP request or response in which the Website's servers received them, while those communications were in transit.

81.     Defendants intentionally configured their website to transmit Plaintiff's and Class members' URL contents to each Tracker, and itself received and used those URL contents for audience segmentation and ad targeting. The Trackers are third parties to the communications between Plaintiff and the Website. Plaintiff and Class members did

29

not consent to this interception, and no other exception applies.

82. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendants through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X.   THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### *By Plaintiff and the Class Members Against All Defendants*

83. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84. Plaintiff brings this cause of action on behalf of himself and the Class.

85. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendants' conduct constitutes both an unlawful and an unfair business practice.

86. Defendants' conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendants violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

87. Defendants' conduct is also unfair. Defendants covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

88. Plaintiff and Class members suffered injury in fact and lost money or

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

property as a result of Defendants' conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendants used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

89.    Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendants and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

90.    Plaintiff and the Class are entitled to injunctive relief prohibiting Defendants  from continuing its unlawful and unfair practices, restitution of monies acquired by Defendants  through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5.

## XI.    FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

#### *By Plaintiff and the Class Members Against All Defendants*

91.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

92.    Plaintiff brings this cause of action on behalf of himself and the Class.

93.    Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of

31

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

94. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

95. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a news and media website does not expect that the specific pages they browse will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

96. Defendants' conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring four third-party tracking technologies on the Website, Defendants caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications and their transmission to Google LLC, Comscore, Inc., Magnite, Inc., and Yieldmo, Inc., where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the news and media website, the sensitivity of the content browsed, the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data. As a result of Defendants' invasion of their privacy, Plaintiff and Class Members have suffered harm including loss of control over their personal data, exposure to unauthorized commercial profiling, and the erosion of a reasonable expectation of privacy in their online communications.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

97. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII.  FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### *By Plaintiff and the Class Members Against All Defendants*

98. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

99. Plaintiff brings this cause of action on behalf of himself and the Class.

100. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

101. Defendants intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding four third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to Google LLC, Comscore, Inc., Magnite, Inc., and Yieldmo, Inc. without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

102. The intrusion is highly offensive to a reasonable person. Defendants covertly deployed tracking technologies that captured the specific content Plaintiff was browsing on a news and media website and transmitted it to multiple third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the nature of the Website and the sensitivity of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent cross-session identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

/ / /

33

103. As a result of Defendants' intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII.   SIXTH CAUSE OF ACTION

### Unjust Enrichment

### *By Plaintiff and the Class Members Against All Defendants*

104. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

105. Plaintiff brings this cause of action on behalf of himself and the Class.

106. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

107. Defendants received a benefit by permitting Google LLC, Comscore, Inc., Magnite, Inc., and Yieldmo, Inc. to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendants received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendants' arrangement with these tracking operators enabled it to monetize its audience through targeted advertising and data analytics, generating revenue at the direct expense of Plaintiff's and Class Members' privacy interests.

108. Defendants received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendants and their tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control

34

over their personal information, which has recognized economic value as a privacy-protective property interest.

109. It is inequitable for Defendants to retain the benefits of their data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendants' concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

110. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendants were unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendants' conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

3. An order enjoining Defendants from continuing the conduct alleged herein;

4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendants through the violation, or $100 per day per violation or $10,000, whichever is greater;

6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

9. Compensatory and nominal damages for intrusion upon seclusion;

10. Restitution and disgorgement of all amounts by which Defendants were unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   April 23, 2026      **LAW OFFICES OF ROSS CORNELL, APC**


By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com


*Attorneys for Plaintiff and the Putative Class*

36